The next case is 4-16-0513, Patrick Murphy, M.D. v. Advocate Health & Hospitals Corporation. Appearing for Appellant are Attorneys Michael Goldberg and Jenna Millager. Okay, thank you. For the Appellant is Attorney David Texson. For the Appellant, it's my understanding that Mr. Goldberg you're going to present initially, and then Ms. Millager you're going to be presenting in rebuttal, is that correct? Correct. All right, thank you. Mr. Goldberg, you may proceed. May it please the Court, Mr. Texson, Dr. Murphy comes before you today asking you to, well not reinstate his privileges, he's asking you to reverse the judge's decision denying his preliminary injunction. When doctors are disciplined in hospitals, they have certain rights because of the ramifications of being reported to the data bank, the licensing board, insurance companies, malpractice carriers. It's because of the ramifications of being disciplined at a hospital. It's going to follow you forever and perhaps prevent you from getting another job. There's a federal law, the Healthcare Quality Improvement Act, which gives you rights. There's the Illinois law, the Hospital Licensing Act, and the Hospital Licensing Act requires the medical staff bylaws to have rights for the doctor. Every hospital in Illinois has medical staff bylaws because of the Hospital Licensing Act. The simple reason that we're saying that Dr. Murphy has a likelihood of success is because there are rights, there are not many. In essence, you have the right to notice and a fair hearing. And there's not a lot of guideline on what that is. You could look at the Hospital Licensing Act, which tells you that you have a right to inspect all pertinent information, a right to present witnesses, a right to an attorney, and a right to a written explanation at the end. There's a special provision that talks about summary suspension, and it talks about how a summary suspension can only be implemented upon documentation that you have at that time. It has to exist. You have to freeze a moment in time when you summarily suspend someone's privileges because it is a pre-hearing, pre-due process right deprivation of your privileges. So what that means, and if you look at Atkins and Gates and Rao and Knapp, all of which we cite, is that if you get the medical chart and you have a bylaw, a hearing that substantially complies with the bylaws, then you don't have a cause of action. Mr. Goldberg, before you proceed into your argument regarding the deficiencies, the alleged deficiencies of the process, just in terms of how this case is postured, I'd like some clarification, if you could. If this court were to agree with Dr. Murphy's position here, what would happen upon, what should be the relief granted by this court? Because there was a complaint for declaratory injunctive relief, and then an emergency temporary restraining order sought. And in the emergency TRO request, there was a request that the underlying fair hearing be declared, or summary suspension be declared void. Can this court do that? Could the trial court have done that in the hearing on the emergency TRO when that was what was requested in the underlying complaint for declaratory relief? Or is this simply a matter of whether or not an emergency TRO should have been entered in regards to the reporting of the summary suspension? Well, the court in Knapp, Gates, talk about reinstating privileges. So courts in those cases, and that issue wasn't touched on appeal, they determine your privileges are reinstated. And that was on consideration of the emergency TRO? I don't know that it was on a TRO, but it was on injunctive relief. Our opinion is that this court and the trial court have the right to void the summary suspension or void the discipline. I don't think that you could preclude the hospital from bringing another action. It's not, I don't believe it's res judicata or collateral estoppel for them to go back and do it again. And so they can still summarily suspend for this case, and they could go back and do it the right way. They can take what's called corrective action, which is you still have your privileges, but we're going to have a process. And at the end of the process, you lose. Then your privileges are taken away. So we did ask for a TRO before the hearing. We were actually in there the same day asking Judge Feldheimer, based on these very issues, because we didn't have the charts and they didn't give us the information. And Judge Feldheimer said, no, we had the hearing that day. Then somewhere down the road, we lost, and we went back in front of him with essentially the same issues. Some other ones had popped up because things happened during the hearing that we didn't know about when we asked for the TRO. But this is where it's so important, and I'll let you get going with the rest of your argument here in a minute. But Judge Feldheimer had to make a determination as to whether or not a fair question existed supporting the underlying complaint such that the TRO should be put in place, right? Correct. And that's what we're reviewing, Judge Feldheimer's consideration of whether or not fair questions existed on the various substantive allegations raised in the complaint, right? So if that's the procedural posture, how can we go farther and address whether or not the summary suspension should be voided? Well, if you – the summary suspension being voided naturally follows that determination. If we would have been in front of Judge Feldheimer when we were in front of Judge Feldheimer before the hearing and we said we don't have the charts, this has to be done within 15 days, the notice is bad, we had objections to the hearing panel member, they haven't been hearing panel members, they haven't been ruled upon. If he had acted on that and said, yes, there is a fair question, I'm going to stop this hearing, I'm going to give you the TRO, the summary suspension is dissolved by definition. I think by operation of law, by the Healthcare Quality Improvement Act and case law, if it is in effect for more than 30 days, it's reported to the National Practitioner Database. That would be going back, in my opinion, to where the notice was. And they have to start over again. So I think it's inherent in the ruling. I think that if Judge Feldheimer would have agreed with us after the hearing and we pointed out even more deficiencies, and he could have prevented – he had the option, I think, of two different remedies, and I've had either or both or neither, depending on how the court ruled. The judge cannot put you back on staff, cannot undo the summary suspension, but they can just prevent a report to the databank until the process is played out. Some courts do that. Other courts say, I'm going to enjoin the databank report. But we stayed his order, so what does that mean? What's been the status in the last six, seven months of Dr. Murphy? He doesn't have privileges. So the effect of the order for staying was to stay the reporting to the National Database? Correct. Okay, so if we were to agree with you that the procedures underlying the suspension were flawed and reverse the denial of the TRO, then if the hospital is still of a mind that Dr. Murphy shouldn't have privileges and they want to take action to deny him privileges at the hospital, could they still proceed to do that? Yes, they can. The ball would be in their court to take some action. Go back in front of the panel and provide the procedures you claim that were necessary? In front of a different panel. The hearing panel can't have prior knowledge. That's in the bylaws. Some panel do the appropriately constituted to hear this? I think they could, yes. I don't think there's any mechanism that would allow a court to tell a hospital they can't engage in peer review. So they're going to do that no matter what we do. You had asked for a permanent injunction as well as temporary and preliminary. Essentially, you just wanted it stopped at that time. Correct. And we stated to stop it. And if we said the trial court stay should be present, then grown men could go back and proceed if they thought that appropriate. I believe they could. I mean, the injunction, the injunctive relief doesn't, I believe, bar the hospital forever from acting against Dr. Murphy. There's only two things that could happen. His privileges, he won't exercise his privileges. They'll expire at that hospital, and they'll be sort of a standoff. It'll be done. Or after the court makes that finding and ruling, then he'll say, hey, I've got my privileges. I'm coming back. I'm going to practice at this hospital. And it'll be up to them at that point to decide what to do. Now, going to the procedural aspects of this, there's a lot of discussion in this case about MIDAS reports. Let me ask you for your explanation about what these things are, how they work, and how they were involved in this case. Well, a MIDAS report, to my understanding, it's like a brand name. It's not saying Kleenex. It doesn't. Right. But what it really is is that I believe the state requires the hospital to keep this type of report when an event happens. It can be anything from a death to some other. Something that the hospital personnel would view as an untoward event, perhaps? It can be, although once they look at them, they could say that nothing happened. But let's say for sake of argument that something causes it to fall out. It's not the average medical chart. And they have people who are employed at every hospital, often a nurse's full-time job, to determine if a case falls out. And then it could go to a committee. So our problem with the MIDAS report, and especially how it ties into the testimony, is it doesn't identify the chart. You don't know what you're talking about. If the MIDAS report accompanied the medical chart, then that would be ideal. So what you wanted was the medical charts that these MIDAS reports pertain to? Right. The notice talked about this EW case, which was, we believe, the initial basis for the summary suspension. You had all the charts about EW, did you not? We had what we thought was the entire chart, but there is a gap between 11.30 p.m. and 4.30 a.m., including the time when the patient died, because they were being monitored off-site. There's an electronic ICU. So whatever was in the chart for that, we don't have. But there was an actual physical medical chart, almost complete, from EW. But then there was an initial notice orally, which was absolutely defective. That was on May 20th. On May 23rd, there was a one-line letter, absolutely violates the law. Then we sent the letter explaining the deficiencies. Then on June 1st, they sent a new letter. One of the contentions that we have is, hey, he hadn't had his privileges since May 20th. Your first stab at summarily suspending him is May 23rd. You have to, by law, give him a hearing within 15 days. He has no privileges. And that expired on June 7th, not June 10th, when we had the hearing, whatever the date was. It was not within 15 days. But the June 1st notice, which let's argue for sake of argument, let's say it was the real notice and that it's valid, it mentions peer-reviewed cases, four peer-reviewed cases, and 10 other documentation issues. Of those cases, we only got two of the four deficient peer-reviewed. It wasn't enough to give us a peer-reviewed report, but we only got two. And of the 10, we only got eight of the MIDAS reports. But here's the thing I want the court to understand, is that when there was testimony about very general complaints, there was no effort to tie them up to the two peer-reviewed reports that we had or the eight other documentation issues that we had. And even if there had been, we still, the standard, the minimum you have to do is just give this person the medical record so that he can defend and cross-examine. You had asked for them? Yes, we had asked for them. What was the response? Well, the response was they gave us the EW, there's a cover letter saying here's what we have. The hospital thinks they gave us more than the committees had before, which to me is scary. First of all, if we never had the medical record, and if what the hospital is saying is, but you guys had more than the people who decided to summarily suspend, then they didn't even have the medical records in front of them, which is troubling. You say that these weren't provided, the bylaws simply require the right to inspect, correct? To review all pertinent information. It's in the bylaws and in the Hospital Licensing Act. We also have the right to cross-examine.  You also assert in your brief that Dr. Murphy was not allowed to go on the Broman premises. Right. But I didn't see that substantiated anywhere in the record that he was not allowed to go on the premises. Where does that come from? Well, when he's summarily suspended, he's shut off from everything. And that was in the trial. I mean, we talked about the fact that it's very specific. There's a nurse whose job it is to call everyone at the hospital and say, Dr. Murphy doesn't, immediately, that's done orally. Dr. Murphy doesn't have privileges. It was also, all of his appointments were rescheduled. It's actually in the bylaws that it says that that's going to happen. If you look at the bylaws, it talks about the fact that immediately upon imposition of a summary suspension, the president of the medical staff or the department chair will be responsible to provide for alternate medical coverage for the patients of the suspended practitioner still in the hospital at the time of such suspension. So they immediately notify everyone that he's persona non grata. And it's of record in the testimony that he can't access the medical chart. He can't do anything. Perhaps he could be in the building. I don't know. But he's not able to practice medicine at all at the hospital. Practicing medicine and having the ability to inspect records are two different things. And the hospital provided him a notice that he had the right to inspect the records. I'm just simply trying to get at, is there evidence in the record that he was precluded from doing that? Well, I would take issue with what you said, because practicing medicine is accessing the medical chart. He can't, the licensing board would consider that practicing medicine. He can't access the medical chart at that hospital. He can't practice medicine. But for sake of argument, to say that he could, in the record, there's testimony that says that he could. It was unrebutted that he couldn't access the charts. I don't know if the hospital is going to argue that he could. But at the hearing, there was unrebutted testimony. I don't have access to the charts. We cross-examined other witnesses that established that he couldn't access the charts. What happened with this later case that we just had concerning this matter? What was that all about? That was, we had a hearing. We tried to stop it. We started the hearing. Hearing on what? Well, it was on EW, the case that we're talking about right here. And then it was about other cases as well. So it was our position that this was, the life of Dr. Murphy at this hospital was essentially over until this court gave us a stay. It was only after this court gave us a stay that they went back and tried to re-discipline him on one of the same cases we're talking about here. The main case here and the main case there are the same. This is EW case and some other cases as well. That matter, I assume, is essentially closed. I mean, they've been prevented from doing that hearing. So once again, I mean, theoretically, I'm not the hospital's attorney, but if this goes well for Dr. Murphy in both cases, there's still a mechanism for them to compile a chart of him, records of what they think is wrong, give him a stay. Give him notice, give him a hearing, not to summarily suspend him, but they can still... Hearing to do what? A hearing to decide if he should be a disciplined physician at that hospital. Could that include suspending his privileges? Not summarily... I didn't say summarily. Yes, it could. So based upon your bad performance, it's no longer an emergency situation. Right. Based upon your bad performance, it's set forth here in these various documents that we're going to present and have testimony about. We don't want you to have privileges at this hospital anymore. We think you're in danger. They have the... Give the proper notice, give him the proper documents, have a properly convened hearing panel, conduct the hearing the proper way, give him the right appeal. Some months later, they could decide to reprimand him all the way up to revoke his privileges. And the reason why it's significant is because that's the official record that will be in the National Practitioner Data Bank. Again, the MIDUS reports are just an internal mechanism for the hospital to... or hospital administration to be flagged about things that might be questionable. Is that how that works? I think that's a good characterization. Both the peer-reviewed documents and the MIDUS reports are one person's opinion about an event, about a medical chart. The problem that we have is, A, we think that you just... I mean, I've never seen a hospital hearing where they don't just give you the medical charts. If you look at the case law and they complain about, oh, the notice was defective, it was very general. And then the appellate court says, yeah, but you got the charts. One of them, you got 30 charts. Another one, you got 38 charts. Another one, they even had the charts at the hearing. If they would have had all 18 charts at the hearing on the table, perhaps that would have been enough. But I've never seen a case where they don't give you the medical charts. That's all you're talking about. Maybe you're entitled to some external review, but they could probably argue you're not entitled to that. There's probably some way, because the case law is so deficient here, that you might not even be entitled to that, but you're certainly entitled to the actual medical chart that you're being criticized for and that your career could potentially be ended for. All right. Thank you, Mr. Goldberg. Mr. Texel. Good morning, again, Justices. Before I begin, I just want to thank you for your time and the consideration of this case today. Obviously, it's important to Dr. Murphy. It's also very important to Advocate Bowman. There are many, many objections raised in Dr. Murphy's papers, essentially. But what I'd like to do, for the sake of time, and I know that our time here today is limited, is I'll just touch on what I think some of the major issues are. First off, there are things about which Mr. Goldberg and I agree and things about which we disagree. One point that was raised initially is that the TRO papers specifically did request to have this summary suspension declared null and void. That's simply in the record. Whether this panel has that power or not, I don't know. I would view that more as almost a mandamus request, where you're not just preserving the status quo, but you're understanding something which has occurred. That wasn't briefed by the parties, whether or not this Court has the ability to avoid the summary suspension. I agree. And as I stand here today, Justice, I don't have the answer to that question. Well, it doesn't really matter if we reverse the trial court, does it? And just say, go back and this wasn't procedurally proper? I would agree, Judge. I think the most important thing, and I'll touch on something that hopefully we have a consensus on in this room, is the most important thing is whether there's a likelihood of success in the merits, and that's tied to the issue of did Broman substantially comply with its bylaws. But if we approach it in that regard, it goes back to the trial court to have an actual hearing. Well, Justice, I would say this. My understanding of all the cases is that generally speaking, there's a rule of non-review. And even on a TRO proceeding, especially here where we have all of the notices which were sent by Broman, and one thing I definitely do want to touch on is the sworn testimony in the record and the records themselves in terms of all of the data which was produced voluntarily by Broman to Dr. Murphy and the fact that Dr. Murphy had a fair hearing, and that transcript has been submitted to you three justices for review. I think if there is no substantial likelihood on the merits, then Judge Fellheimer is correct in denying the TRO, which is obviously an extraordinary measure. It's an extraordinary relief. And it's difficult for us. I mean, one thing I'll just touch on again, it's difficult for us, for Broman, to have a bit of a moving target in terms of what they were requesting in their papers. They've emphasized declaring the summary suspension null and void, which is initially what we had to respond to at least from a litigation perspective. More recently, they seem to be saying, well, no, we just want you to enter an order which permanently enjoins a report to the data bank. No, counsel, I just have to point out that in the emergency motion for the TRO, there are two separate requests for relief. The first one is a declaratory finding that the summary suspension is null and void. Correct. That goes right to the heart of the complaint itself. The second request is a request for injunctive relief, prohibiting the enforcement and reporting of the summary suspension. But what's before this Court is a prayer for relief that would allow for, arguably, allow for this Court to avoid the summary suspension itself. I understand, Justice, and you're correct. And if I misspoke, I apologize. There were alternative measures of relief. But the initial issue that I think Judge Fellhammer had to deal with is this concept of the issuing a TRO, which would render the summary suspension null and void. Let me cut to what is, I think, the case in this case that is key. And I thought by your initial remarks, the stakes are very high. On the one hand, it's very important that hospitals be able to suspend and revoke the privileges of doctors who the hospital believe these doctors aren't practicing medicine appropriately for whatever reason. On the other hand, this is real important stuff. This is, for the doctor involved, this is like the death penalty maybe for his practice of medicine. So the stakes are, could not be higher. So I suppose my question is, given that, why is there any question about the procedural niceties, for lack of a better way to put it, given that Mr. Goldberg, in advance of this hearing, said, we want the documents you're relying on. Why not just say, okay, here they are? To put it another way, you're dealing with people who, I'm a former prosecutor a long time. In a criminal case, prosecuting some guy, his attorney says, what are the documents you're getting? I say, here they are. I got no secrets. This is police reports and witness statements. And particularly, for instance, with regard to MIDUS reports that contain no identifying data as to who is this patient and the like. These are Dr. Murphy's own patients. There can't be any confidentiality issue. These are his patients and his doing with handling of them. Why didn't you just say, here's everything? Justice, if I may, that's a very good point. First off, the bylaws, as pointed out by one of the other justices, say that Dr. Murphy has the right to inspect the basis for the summary suspension. There's nothing in the record, and unless I missed it, I scoured the record over the weekend. There's nothing in the record where Dr. Murphy, under oath, says, I requested the opportunity to go to the hospital and review all the records, and I was denied. I don't believe that exists. Is that a requirement under these circumstances? Why are we worried about that kind of technical stuff? His lawyer says, give us the material you're relying on. Why not answer? Here it is. Well, Justice, I think the single most important thing for me right now is to have time to explain to you the medical data that was produced. And there's only one bit of sworn testimony in the record, and that's from Mary Matthews, who's the in-house counselor for Abigail Broman. And it's important to understand that the complete medical record and the pictures for EW was produced. Oh, sure. Okay. And all of the MIDAS reports were produced. And all of the closed peer review. But what's stopping right there? The MIDAS reports don't contain any identification regarding the patients to whom they pertain, do they? I will touch it. May I work through this top to bottom? Okay, go ahead. If I may. Let me explain this. Technically, under the bylaws, perhaps the hospital could have said, okay, you'll need to come and inspect the records. But counsel and Mr. Goldberg and I have been opponents before in these cases. In any event, counsel contacted us on behalf of Dr. Murphy and made very specific requests. So if I could refer you to their Exhibit H in the record at C533. It's also attached to the appendix as A191. This is a letter authored, I believe, by Ms. Malager on June 6, 2016. It's addressed to me and it's addressed to the in-house counselor for Abigail Broman. I'm sitting in my office in Chicago, so I have access to nothing. I think I was hired on June 6. So in any event, point one, all minutes of all medical staff and hospital meetings at which Dr. Murphy endured his medical staff membership or clinical privileges have been discussed since he joined the medical staff. That's sort of an unreasonable document request. We produced all the minutes we could find related to the summary suspension procedure. Point two, Dr. Murphy's credential slash personnel file at Abigail Broman Center. Right away, between June 6 and June 9, his complete credentials file and his complete quality file were turned over. So there's a lot of information in both of those. So that request was fully complied with. Three, all internal or external reviews of any of Dr. Murphy's medical charts or patient care rendered by Dr. Murphy. All of those internal and external reviews were turned over that I know of. There were only two closed peer review reports. These are from prior cases that ultimately were decided. One was an OFI, an opportunity for improvement. The other was a no OFI. So that was fully turned over, and that was presented to both the hearing committee and the Judge Feldheimer as our Exhibit 11. That's also, I believe, that's all of the exhibits I'll be referring to are in volume five of our papers. Moving on in this specific letter from Ms. Malager. Point five, all witness statements gathered during the investigation of Dr. Murphy. There were no witness statements, but there was a very key document prepared by Dr. Nevin, which was a memo to the file essentially about the summary suspension. So that was turned over. I may refer to that later if I have time. Six, a copy of any reports of autopsies performed on EW. Mr. Counsel, this isn't helpful. I've waited to give you an opportunity to respond. I directed your attention to the MIDAS reports in particular. I want to hear your response. Understood, Justice. If I may, I'll address the MIDAS report. And I should add, by the way, your closing arguments seem to make reference to these documents. This isn't a matter of if it was error to consider. Maybe it was harmless error because your argument to the panel was, you know, you don't even have to pay attention to it. Your argument specifically referenced these documents that don't include any identification as to the patient that they were involved. Understood, Justice. If I may. Go ahead. I'm just flipping to our group exhibit 12. And bear in mind, and I'm looking at these MIDAS reports, and they're in the record as C607-C615. The first two are fairly extensive and they're very detailed. They're dated, if you have the time to look at them. I've looked at them. Okay, understood. But the first two relate exclusively to EW. So obviously the complete medical record for that was turned over. The second, or I would say, pardon me, I don't know if that's the second or the third. On page C610, there is a case which was actually reported by Dr. Chu. He did mention it briefly in his testimony at the hearing. So it's got the date the patient was admitted, his concerns, the follow-up. And as far as I know, there was no adverse consequences with this patient. I don't even know that this – Counsel, you're missing the point here. I keep on asking you. As part of the case against Dr. Murphy, the hospital used these reports, apparently thinking they contained some bad stuff. They contained support for their claim that Dr. Murphy isn't practicing medicine appropriately. He says, who are these people? And the reports don't seem to contain any identifying information. How is Mr. Goldberg, on Dr. Murphy's behalf, supposed to respond to these modest reports? And I should add again, the hospital was – no one was pointing a gun at the hospital saying you had to do this stuff. Had you just presented the EW case and some of the other peer review cases pertaining to your charge that Dr. Murphy didn't handle this appropriately, that would be an entirely different matter. But you didn't. The hospital did. The hospital presented all this other stuff and argued this is something the panel should consider when deciding this question. So my point – my question is, how can that be appropriate? How can that be procedurally fair to Dr. Murphy? And why did the hospital do it? Why don't you just give them all the information pertaining to the MIDAS reports? Justice, we never received a request for the medical charts related to the MIDAS reports. And all of this was done – Now, counsel, you said Mr. Goldberg – we want all the documents you're going to use against us. Essentially, that's what this – any fair reading of it, that's what it says. If you're going to use some documents against us, we want to see it. The MIDAS reports are submitted because the hospital, the only reasonable inference is, thinks it supports its case against Dr. Murphy. I mean, this is not something unrelated. Why didn't you identify – why didn't the hospital – and I don't mean you, you may not be involved – why didn't the hospital, simply to be fair to Dr. Murphy, if they're going to rely on these reports, provide the identifying data and the underlying medical charts? Justice, if I may. Go ahead. The point – and I can't necessarily get inside Roman's mindset, but I do want to – I did want to emphasize what was produced. And I understand – I'm not interested in what was produced. I'm particularly concerned about what wasn't produced in the face of their request. And to be real clear, given that you presented these, I think there were eight or ten of these, without identification, how can we conclude that this was a fair procedure for Dr. Murphy? Understood, Justice. If I may, the question, the ultimate question here, is what did the – whether you call it the Emergency Action Subcommittee or the MEC – what did they rely upon in issuing the summary suspension? Beginning on May 20th, when the subcommittee first met, and then on May 23rd, when the MEC met, the things which they reviewed were the – they had access to the electronic – electronic medical records. So that's what they reviewed. Now, there was some discussion of other peer review reports over the past 18 months. So the hospital fully and honestly disclosed that, that yes, other issues were considered. Justice, you're correct. In a very expansive environment, you would turn over all of the medical records for the MIDAS reports as well. But that's not – those are not documents or data which were reviewed by the MEC or any of the members of the hearing committee. They were almost entirely focused on EW. But they also just honestly disclosed, yes, we took into account his recent peer review history. And I agree with you, the MIDAS – So this is an argument that the MIDAS reports that were submitted weren't really considered by the panel and weren't really part of their decision? You mean the hearing committee? Yes. The hearing committee references prior peer review cases in its last paragraph as its basis. And the peer review cases would be our Group Exhibit 11. Well, someone had to decide, you know, as part of our case against Dr. Murphy, let's include the MIDAS reports. Isn't that right? I think the MIDAS reports were actually part of his quality file. And from our perspective, and I will take responsibility for this, because I am the one – and bear in mind, it's a summary suspension proceeding. So you don't have a lot of time to make a decision. From my perspective – That's, you know, it goes back to what I said before. I'm the prosecutor. When in doubt, turn off everything. Right. How difficult would it have been, say, we got MIDAS reports, and, you know, regarding some particular story that surely the hospital must be able to tell in some manner some internal mechanism to whom the MIDAS reports refer to? Give that stuff to Dr. Murphy. Understood, Justice. I would comment, again, two things. One, the medical charts associated with the MIDAS reports were not requested, so we didn't respond to that. Also, this is a very compressed timeframe. Dr. Murphy, as pointed out by Judge Belheimer, did not request a continuance. He did not notify us after receiving the MIDAS reports. And, again, this is all happening between June 6th and June 10th. If we had gotten a request for a continuance or some other notification that you'd want the whole complete medical record, but some of these – if you look, if you have, you know, Exhibit 12 is really the tone and tenor of these MIDAS reports. I'm just flipping through some of which these were produced, but, you know, I'm looking at MIDAS report on page C612. It simply says, patient admitted a floor-scheduled cardiac cath with no home medications addressed by physician. Home medication list was entered by RN and cath lab. So these are not peer-reviewed cases. These are not concerns that rise to the level of prosecution. They're simply part of his quality file. And, Counselor, let me interrupt you. I want to make sure I understand this. The record would bear this out, that Dr. Murphy never requested the charts of these patients for which there were the MIDAS reports or the peer reviews for which the charts weren't voluntarily provided for by Brohman prior to the hearing? Absolutely, Justice. And the reason I started out my argument by referring to their counsel's letter is because this is what we had to respond to. Were they requested at the hearing? I don't – oh, at the hearing itself. Right. I would say the hearing – I would say the hearing itself, they objected to referring to any cases besides the EW case. But they did not request a continuance. And I don't recall – I'd have to go back and look at the opening of the transcript. I know Mr. Goldberg objected to two issues at that time. Issue number one was that the hearing panel members, some of them may have been employed by Advocate. And issue number two was essentially arguing, look, this is all about the EW case. We don't want any reference whatsoever to other patients. Now the only questions I asked, and I recall asking a question of Dr. Chu, I just said, what did you discuss at the May 20 meeting? And that's where you have the one in the summary suspension notice. You have one through eight. They all relate to the multiple concerns associated with EW's care. At the very end, there's reference to, yeah, we did talk about other – his recent peer review history. So Dr. Chu did give some limited testimony on that. But it was more justice from our perspective in trying to present this case. It was just an honest disclosure that, yes, his recent peer review history had been discussed. So – and in terms of proof, we received no further requests before the hearing other than this June 6 letter, which is very specific. And it doesn't ask for any medical charts. And I'll pause there. And I recommend to you, at least before you decide this case, please consider the affidavit of Mary Matthews. It talks about all of the documents and data. There were two complete medical records produced. One was for EW, and the other was for another patient named M.A. Let me read to you from one of your latest reports in the record, dated 12-10-2015, 7-49 p.m. After receiving the report, it was ordered that the patient was scheduled for a cardiac characterization at 0800 and the patient had an allergy to contrast with no orders on the chart for allergy. Night shift was aware of catheterization time and no intravenous fluids had been started because there were no orders for those either. This RN didn't override for IV fluids, looked up contrast allergy protocols, didn't override on those, and paged the physician. Referee promptly called back. I told him all the medications I pulled and asked if he was okay with them. His IV fluids were started. It was noted that the patient's IV was infiltrated. IV fluids were stopped. And a new IV was attempted by this RN. Three other RNs attempted to start an IV. The patient ended up being stuck eight times before it was successful. All these setbacks delayed the patient's care. The alleged protocol of new IV and fluids could have been started long before day shift. That was one of the matters submitted as an I-report as the basis for Dr. Murphy's suspension. And you provided no information about who this patient was or anything else, did you? Justice, that is correct. Although I will state that it's plain, and I'm not sure which one you were reading from, but each and every one contains a time stamp and the date that the medical care is provided. So if Dr. Murphy had wanted to follow up and inspect the medical care... And no burden upon you to provide it after he said, give me the stuff you're going to rely on. That wasn't good enough? Justice, if I may, we are wordsmiths as lawyers, and we can only respond to what is asked. And that's why I keep pointing back to that June 6th letter. There is no request for medical charts in that letter. Now, we went ahead and produced the complete medical record of EW, because that is the sum and substance of what this case is about. And again, as I said, the hospital decided we better produce the complete medical record of MA, who is a patient who was treated by Dr. Murphy in December of 2014, and thereafter that turned into a closed peer review case where there was an OFI. These MIDUS reports are simply safety reports which are kept internally as records. And they're not... These are not... I mean, I do not know where they're at in the peer review process. Some of them do say refer to peer review. Some of them are not. The closed peer review cases were produced. But the reason... There's no way for me to know exactly... There's no way for me to know exactly what Dr. Chu, Dr. Brostat, and Dr. Nevin reviewed on May 20 and May 23. They're the ones who were charged with making this difficult decision. But these MIDUS reports, at least from my perspective, Justice, these are circumstantial evidence that there might be a problem. Okay, Mr. Texson, you're out of time. Okay, understood. Ms. Mleiker. Thank you, judges. I want to start by immediately addressing Mr. Texson's argument that we did not request the medical records. Our June 2nd notice of hearing, or request for hearing, which was sent the day after we received the June 1st notice of hearing, or notice of summary suspension says, please be advised that this request for an interprofessional conference assumes that all documentation on which the summary suspension is based has been provided to our office as counsel for Dr. Murphy expeditiously. The only pertinent information in a case where quality of care is at issue is the medical record. That is the record where everyone in the hospital who's involved in the care of the patient documents, they're mandated to keep medical records. That is the pertinent document. If you look at the case law Adkins, Knapp, Rau, in all of those cases the notices contained alleged general deficiencies in quality of care coupled with charts. The charts provide the physician the opportunity to cross-examine and rebut the allegations concerning the quality of care. As Mr. Goldberg said, there has not been a hospital hearing we've done where the medical charts are not provided. EW, or what was purported to be the entire medical record for EW, was provided, although we dispute as to what's missing from that. EW was the only medical record that was available at the hearing. There were no other medical records at the hearing. Could the hearing committee base its decision on matters that were not in evidence? No, I would say they cannot. Were these exhibits admitted into evidence? They were not admitted into evidence. So are you arguing that you were entitled to something upon which the hearing committee did not base its decision? Yes. Yes, we are. Because by not having the medical chart, we were not able to cross-examine or rebut the testimony of the MEC's witnesses. There was testimony from Dr. Chu, Dr. Nevin, and Dr. Bracedad about other cases, quality of care issues. So that was in evidence? Yes, through the testimony. I guess I was thinking you were referring to documents. But yes, there was testimony from the witnesses about other cases. And that is where the prejudice to Dr. Murphy comes in. And not only did the MEC's witnesses testify to other cases, but Mr. Texan argued to the judge, the hearing officer, over our objection when we were objecting to testimony about other cases, not EW, that he believed that the basis of the summary suspension was not EW, not just EW. It was on other cases. So if the MEC wanted to make it just about EW, they could have done that. But they didn't. The notice has four other peer review cases and ten other reports of inadequate documentation and management. You have testimony at the hearing. You have argument from counsel that this is the basis from the summary suspension. And then you have a hearing committee decision that adopts the finding related to other peer review cases and ten other reports of inadequate documentation or management. The prejudice to Dr. Murphy is clear. And he was not able to have a fair hearing. And one last comment that I want to make. Justice Harris, you asked about, well, did Dr. Murphy, could he have gone to Berlman to access the medical charts? Well, let's assume that he could have gone to Berlman to access the medical charts. The notice doesn't even have patient initials, dates of service, medical record numbers on them. How would he even know what he's looking at? How does he know what these reports are? Does that put the onus on him to make the request for that information? We did, Judge. We request all pertinent information on which the summary suspension was based. The case law contemplates that the medical records are produced. That is the only pertinent document. Did the hearing committee base its decision on records that weren't included within the binder of exhibits? In other words, the MIDAS reports and the peer review reports that were provided, that constituted the basis on which the hearing committee based its decision in addition to the EW materials. So they didn't go beyond what had been provided. You're saying it just wasn't sufficient enough to allow Dr. Murphy the ability to cross-examine on those peer review reports and MIDAS reports? Absolutely. Yes, Judge. And if I could, and I want to read from Atkins because I think this is extremely important. The court, when it was addressing the statement of the alleged notice deficiency in that case, the Supreme Court said, even if the issues could be more precisely stated in the notice, the fact that the relevant charts were included was sufficient under the language of the bylaws and under basic notions of fairness to constitute adequate notice. And I think that speaks volumes. And I think the other case law, Atkins, Knapp, Rao, discussing notice coupled with charts, is the standard for adequate notice under the Hospital Licensing Act. Thank you. Thank you all. The case will be taken under advisement and a written decision shall issue.